STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JAMES
H. HALL, JR., DEFENDANT-APPELLANT.

Argued December 7, 1982—Decided July 14, 1983.

554

*Stuart Surick* argued the cause for appellant.

*Debra L. Stone,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HANDLER, J.

The issue presented by this appeal is whether the Superior Court had jurisdiction and adequate grounds to compel the defendant to submit to a lineup prior to his arrest or the filing of any charges against him. We now hold that the Superior Court has jurisdiction to issue process compelling a suspect to submit to a lineup prior to the filing of criminal charges upon a showing of less than probable cause, provided certain evidential standards and protective procedures are satisfied.

I

In the early morning hours of February 3, 1978 an armed robbery took place at the home of James Bailey, in Cliffwood Beach, New Jersey. Bailey and his girlfriend, Stacey Dillon, had just arrived at the home when two male intruders appeared, one white and the other black. The white male demanded that Bailey produce ten pounds of marijuana that he believed was in the house. Bailey explained that he did not have the marijuana, but that Michael Huff, from whom he had purchased nine ounces of marijuana, had the contraband.

After Bailey turned over the nine ounces of marijuana that he did possess, the intruders began an exténsive search of the home. They cut the wires from several stereo components, ripped a television from its casings and tore a telephone from the wall. At this time one of the intruders also took Bailey's wallet. The black man then took Dillon into a front room and tied her hands. Later she was taken into the bedroom and tied to Bailey. As the intruders were leaving, one of the men told Bailey that they would return Bailey's television and stereo when they received money owed to them by Michael Huff.

Dillon and Bailey freed themselves and telephoned the latter's roommate, Louis Campanelli. They did not immediately call the police because the incident involved drugs. After learning of the robbery, Campanelli, Huff and two other friends arrived at the house. The police were then called. When the police arrived, the two victims gave complete descriptions of the intruders.

Subsequent police investigation of the episode revealed that the defendant, James H. Hall, Jr., might have been one of the intruders. A week after the robbery Detective Joseph Booket of the Aberdeen Township Police Department called the victims and requested that they come to police headquarters to assist in the preparation of a composite sketch of the two perpetrators. Dillon, who had been able to observe the white intruder from a distance of five feet during the robbery, was unable to identify

defendant from a series of photographs of potential suspects. Bailey made an equivocal identification of defendant's photo, noting that he could not be absolutely sure because the man's hair in the photo was a "lot shorter" than it was on the night in question. Based upon this tentative identification, the Monmouth County prosecutor moved for an order compelling defendant to appear in a lineup. Over defendant's objections and following a hearing, the trial court granted the motion and scheduled a lineup.[1]

After viewing the court-ordered lineup, Dillon twice identified defendant as one of the men who robbed her. Bailey also viewed the lineup and positively identified defendant. Immediately after the lineup the police swore out a criminal complaint against Hall. Defendant was charged in a five-count indictment with entering with intent to steal, robbery of goods valued in excess of $500, armed robbery, assault with an offensive weapon, and possession of a dangerous weapon.

Defendant was found guilty by a jury on all counts with the exception of assault with a deadly weapon. Thereafter, defendant moved unsuccessfully for a new trial, arguing that the court-ordered lineup was improper and that the jury verdict was tainted. The Appellate Division affirmed the convictions. 183 *N.J.Super.* 224 (1982). The Court granted the petition for certification limited to the issue of the validity of the order compelling the lineup. 91 *N.J.* 195 (1982).

## II

Defendant challenges the jurisdiction of the trial court to issue an order compelling an unarrested and uncharged suspect

---

[1]Prior to the lineup, a man entered Bailey's place of employment looking for Bailey. A co-worker advised Bailey that the man had asked for him on a previous occasion. Bailey followed the man outside and saw him walk to a car in which defendant was sitting. Defendant exited the car and exclaimed "Jimmy [Bailey], I never saw you before in my life. I didn't do it. Do you know how many guys look like me . . .?" Bailey responded by shaking his head.

to appear for a lineup. He relies upon *State v. Schweitzer,* 171 *N.J.Super.* 81 (Law Div.1979), which held that the Superior Court lacked jurisdiction to subject an individual to a pre-charge or pre-arrest detention. In its decision below the Appellate Division expressly overruled *Schweitzer,* finding untenable its "parochial view that both subject matter and personal jurisdiction in the judicial branch are marked at their extremities by the indictment and the imposition of sentence." 183 *N.J.Super.* at 288. The Appellate Division ruled that under *N.J. Const.* (1947), Art. VI, § III, pars. 2 and 3[2] the Superior Court possessed jurisdiction over criminal matters including ordering a suspect to appear for a lineup. *Id.* at 229.

We concur with the Appellate Division's conclusion that the State and federal constitutions authorize the judiciary to order a lineup in these circumstances. We determine, however, that the jurisdiction of a court to issue process authorizing a pre-charge or pre-arrest detention in conjunction with a criminal investigation is founded on the judiciary's constitutional powers over searches and seizures. *N.J. Const.* (1947), Art. I, par. 7 and *U.S. Const.,* Amend. IV.[3]

We believe that an application to detain a suspect for the purpose of conducting a lineup must be considered as "the

---

[2]Art. VI, § III, par. 2 provides: "The Superior Court shall have original general jurisdiction throughout the State in all causes."

Art. VI, § III, par. 3 provides in pertinent part: "Each division [of the Superior Court] shall ... hear such causes, as may be provided by rules of the Supreme Court."

[3]The language of these State and federal constitutional provisions is nearly identical. *N.J. Const.* (1947), Art. I, par. 7 provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.

*U.S. Const.,* Amend. IV reads:

functional equivalent of an application for[ ] issuance . . . of a search warrant." *In re Fingerprinting of M.B.,* 125 *N.J.Super.* 115, 122 (App.Div.1973) (application for an order compelling fingerprinting of an entire class of public school students during a criminal investigation); *see also In re Morgenthau,* 188 *N.J. Super.* 303 (App.Div.1983); *State v. Foy,* 146 *N.J.Super.* 378 (Law Div.1976), app. dism. 153 *N.J.Super.* 503 (App.Div.1977); *Matter of Abe A.,* 56 *N.Y.2d* 288, 437 *N.E.2d* 265, 452 *N.Y.S.2d* 6 (N.Y.1982) (judicial authority to compel investigatory detention rests on court's power to issue search warrants); *People v. Marshall,* 69 *Mich.App.* 288, 244 *N.W.2d* 451 (Mich.Ct.App.1976) (same); *cf., Wise v. Murphy,* 275 *A.2d* 205 (D.C.1971) (court's power to issue investigatory process rests on statutory authority); *State v. Grijalva,* 111 *Ariz.* 476, 533 *P.2d* 533 (Ariz.1975), *cert.* den. *sub nom. Grijalva v. Arizona,* 423 *U.S.* 873, 96 *S.Ct.* 141, 46 *L.Ed.2d* 104 (1975) (court's jurisdiction over pre-arrest detentions based on statutory authority). An individual who must submit to a lineup is detained by the police and visually examined by crime victims or witnesses. Because such a detention, like a search, invades an individual's privacy and, like any seizure or arrest, restrains personal liberty, the constitutional interests upon which investigatory detentions and conventional searches and seizures may intrude are similar. *Davis v. Mississippi,* 394 *U.S.* 721, 726–27, 89 *S.Ct.* 1394, 1397, 22 *L.Ed.2d* 676, 680–81 (1969); *see also Terry v. Ohio,* 392 *U.S.* 1, 19, 88 *S.Ct.* 1868, 1879, 20 *L.Ed.2d* 889, 904 (1968); *United States v. Place,* —— *U.S.* ——, ——, 103 *S.Ct.* 2637, 2645, 77 *L.Ed.2d* 110 (1983). Further, the purpose of investigatory detentions is similar to that of conventional searches and seizures. They are undertaken to advance the investigation of criminal cases. Ad-

---

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

ditionally, judicial supervision of the criminal process in the investigatory stages of a prosecution, just as in the accusatory phases, permits a salutary review of police actions and protects the constitutional rights of citizens who are suspects in criminal investigations or otherwise embroiled in the criminal process. *See generally United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.2d* 1149 (1967); *compare Kirby v. Illinois,* 406 *U.S.* 682, 92 *S.Ct.* 1877, 32 *L.Ed.2d* 411 (1972). These considerations lead us to consider and treat such investigatory detentions as searches or seizures within the scope of the Fourth Amendment and the State Constitution. Regarded as a search or seizure, investigatory detentions are properly within the jurisdiction of the judiciary to ensure they are reasonable.

In sum, we hold that the Superior Court has jurisdiction to authorize investigative detentions. This power to authorize investigative detentions is properly founded upon the judiciary's constitutional authority governing search and seizures, *N.J. Const.* (1947), Art. I, par. 7 and *U.S. Const.,* Amend. IV.[4] When this jurisdiction is invoked, it triggers the judicial responsibility to assess the need advanced by law enforcement for such procedures and to protect the rights of individuals to be free from unreasonable searches and seizures.

### III

We next consider whether the constitutional rights of individuals against unreasonable searches and seizures are ade-

---

[4]Although this constitutional basis for jurisdiction is different from the constitutional basis relied upon by the Appellate Division below, it does not conflict with the Appellate Division determination. The Appellate Division relied on *N.J. Const.* (1947) Art. VI § III, pars. 2 and 3. This analysis recognizes that once jurisdiction is established to authorize a pre-arrest or pre-charge lineup, such jurisdiction rests with the Superior court. Both views are consistent with other decisions that recognize that a court's jurisdiction over the administration of criminal justice is pervasive. *E.g., State v. Williams,* 93 *N.J.* 39 (1983); *State v. Leonardis,* 73 *N.J.* 360 (1977); *State v. Leonardis,* 71 *N.J.* 85 (1976); *see State v. Goodman,* 92 *N.J.* 43 (1983); *State v. Robinson,* 148 *N.J.Super.* 278 (App.Div.1977).

quately protected by investigatory detentions that are judicially authorized upon less than probable cause and whether certain procedures must be followed in conducting such detentions. In its opinion below, the Appellate Division observed that a court-compelled lineup constituted a less severe intrusion upon privacy interests than a conventional search or seizure and that such a personal lineup could be authorized where " 'the State has established a well-founded suspicion of sufficient weight to justify compelling [a criminal suspect] to submit to an in-person line-up.' " *State v. Hall, supra,* 183 *N.J.Super.* at 231 (quoting from trial court decision granting State's motion to compel lineup). Other decisions in this jurisdiction have similarly approved comparable investigatory detentions on less than probable cause. *See In re Fingerprinting of M.B., supra* (fingerprinting); *see also State v. Bradshaw,* 170 *N.J.Super.* 527 (App.Div.), certif. den., 82 *N.J.* 276 (1979) (lineup); *State v. Foy, supra* (lineup).

Our consideration of the requisite standards to be applied in this area focuses on the Supreme Court's decision in *Davis v. Mississippi, supra.* There the Supreme Court considered whether fingerprints taken from a defendant in the course of an investigatory detention conducted on less than probable cause were admissible in evidence. It observed that "... because of the unique nature of the fingerprinting process, such detentions might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional sense." 394 *U.S.* at 727, 89 *S.Ct.* at 1397–98, 22 *L.Ed.2d* at 681 (citation omitted). The Court went on to describe the salient features of an investigatory detention for the purpose of fingerprinting.

Detention for fingerprinting may constitute a much less serious intrusion upon personal security than other types of police searches and detentions. Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search. Nor can fingerprint detention be employed repeatedly to harass any individual, since the police need only one set of each person's prints. Furthermore, fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or con-

fessions and is not subject to such abuses as the improper line-up and the "third degree." Finally, because there is no danger of destruction of fingerprints, the limited detention need not come unexpectedly or at an inconvenient time. For this same reason, the general requirement that the authorization of a judicial officer be obtained in advance of detention would seem not to admit of any exception in the fingerprinting context. [*Id.* at 727–28, 89 *S.Ct.* at 1398, 22 *L.Ed.*2d at 681][5]

Our reading of *Davis* convinces us that for certain detentions—those that do not entail significant intrusions upon individual privacy or freedom, are productive of reliable evidence, and can be effectuated without abuse, coercion or intimidation— "no probable cause in the traditional sense" is necessary in order to obtain the "authorization of a judicial officer[.]" We conclude that, under a "narrowly defined" set of circumstances, such detentions can be constitutionally permissible. *Davis,* 39 *U.S.* at 727–28, 89 *S.Ct.* at 1398, 22 *L.Ed.*2d at 681. Strictly limiting the circumstances under which such detentions take place insures that the restrictions upon individual privacy and freedom interests are minimized so that a showing of need upon less than traditional probable cause can be tolerated. *See United States v. Place, supra,* —— *U.S.* at ——, 103 *S.Ct.* at 2642 (minimally intrusive detention can be supported on less than probable cause); *Terry v. Ohio, supra,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 29 *L.Ed.*2d at 909 (permitting police to conduct "stop and frisk" upon less than probable cause); *Michigan v. Long,* —— *U.S.* ——, 103 *S.Ct.* 3469, 77 *L.Ed.*2d 1201 (1983) (permitting police to conduct protective search for weapons in passenger compartment of car upon less than probable cause); *cf. Camara v. Municipal Court,* 387 *U.S.* 523, 87 *S.Ct.* 1727, 18 *L.Ed.*2d 930 (1967) (permitting search upon probable cause determined by administrative standards).

We accordingly conclude that an evidential finding of probable cause to believe that a particular individual has committed a

---

[5]The Supreme Court in *Davis* did not actually decide whether "procedures for obtaining, during the course of a criminal investigation, fingerprints of individuals for whom there is no probable cause to arrest" could pass muster under the Fourth Amendment.

crime is not an absolute prerequisite for judicial authorization of an investigatory detention. We are satisfied that a court has jurisdiction to authorize an investigatory detention under the following limited circumstances. The court's authorization of an investigatory detention must, first, be based upon sufficient evidence to demonstrate that a particular crime has occurred, that the crime is unsolved and that it is under active investigation. Second, the police must demonstrate a reasonable and well-grounded basis to believe that the individual sought as the subject of the investigative detention may have committed the crime under investigation. Additionally, it must be shown that the results of the detention will significantly advance the criminal investigation and will serve to determine whether or not the suspect probably committed the crime. Further, it must also appear that these investigative results cannot otherwise practicably be obtained.[6]

In addition to these evidential standards that serve to limit the circumstances under which investigatory detentions may be judicially authorized without probable cause, we recog-

---

[6]These standards, in some ways, parallel those adopted in the American Law Institute's Model Code of Pre-Arraignment Procedure Art. 170, Order to Appear for Identification Procedures (1975). With respect to "identification procedures," Section 170.2(6) provides:

*Basis for Issuance.* The authorized official shall issue a nontestimonial identification order only if he finds that the application meets the requirements of this Section and that, on the basis of the proceedings before him;

(a) there is reasonable cause to believe that an offense specifically described in the application has been committed;

(b) there are reasonable grounds to suspect that the person named or described in the affidavit may have committed the offense and it is reasonable in view of the seriousness of the offense to subject him to the specific identification procedures set forth in the application.

(c) the results of the specific identification procedures will be of material aid in determination whether the person named in the affidavit committed the offense; and,

(d) such evidence cannot practically be obtained by the investigating officer from law enforcement agency or other public official or agency.

nize that appropriate procedures must be fashioned to assure that the intrusiveness of the detention is properly circumscribed. Investigatory detentions can involve different kinds of evidence-gathering procedures with differing degrees of intrusiveness. The Supreme Court in *Davis* emphasized that a detention to permit fingerprinting constituted a limited intrusion into a person's liberty and privacy because fingerprinting did not "prob[e] into an individual's private life and thoughts." A detention for fingerprinting was also regarded as essentially a reliable, simple and expeditious proceeding that could be conducted fairly and without palpable abuse. *Davis, supra,* 394 *U.S.* at 727, 89 *S.Ct.* at 1398, 22 *L.Ed.*2d at 681. Accordingly, we conclude that those identification procedures that are comparable to fingerprinting will be sustainable upon a showing of less than traditional probable cause.[7]

In this case, we think that a lineup for the purpose of securing an identification of the criminal suspect can be conducted in conformity with such standards and likened to the

---

[7]We believe that certain types of procedures constitute intrusions that are significantly different from the fingerprinting process, *see United States v. Dionisio,* 410 *U.S.* 1, 14–15, 93 *S.Ct.* 764, 771–72, 35 *L.Ed.*2d 67, 79–80 (1973) (distinguishing blood samples from voice or handwriting exemplars and fingerprinting), and would not satisfy the rationale in *Davis.* The range of such procedures that can be conducted during an investigatory detention is offered by ALI, Model Code of Pre-Arraignment Procedure § 170.1(2), which provides:

*Definition of "Identification Procedures."* As used in this Article "identification procedures" shall mean

(a) procedures to obtain identification by fingerprints, palm prints, footprints, body measurements, dental impressions, or other reasonable body surface examinations;

(b) procedures to obtain specimens or samples of blood, urine, saliva, hair or fingernails, or other bodily substances that can be obtained by comparable methods;

(c) procedures to obtain identification material that may be on the surface of the body or under fingernails or that can be obtained by comparable methods; and

(d) procedures to obtain witness identification through lineups, photographs, voice samples or handwriting exemplars.

fingerprinting process. The lineup involves no creative or unusual act on the part of the suspect; it involves only a display of evidence that is otherwise publicly visible. *See Katz v. United States,* 389 *U.S.* 347, 351, 88 *S.Ct.* 507, 511, 19 *L.Ed.*2d 576, 582 (1967). In this regard the lineup does not "prob[e] into an individual's private life and thoughts." *Davis, supra,* 394 *U.S.* at 727, 89 *S.Ct.* at 1398, 22 *L.Ed.*2d at 681. Furthermore, the lineup, when properly conducted, can protect against abuse and insure fairness. *See United States v. Wade, supra.* When conducted properly and fairly the procedure can furnish reliable evidence and can often be an effective crime-solving tool. *Id.; see also State in the Interest of W.C.,* 85 *N.J.* 218 (1981). Finally, the lineup procedure can be accomplished at a convenient time and need not entail a restraint upon the suspect for an unduly long period of time.

■■■ In order to safeguard constitutional interests and secure the overall reasonableness of such nontestimonial identification procedures, the conduct of investigatory detentions must be carefully circumscribed by other procedural protections. *Davis v. Mississippi, supra,* 394 *U.S.* at 728, 89 *S.Ct.* at 1398, 22 *L.Ed.*2d at 681. (implying that requirements of the Fourth Amendment could be met by narrowly circumscribed procedures); *see also State v. Valencia,* 93 *N.J.* 126 (1983) (in addition to evidential showing, telephone authorized search must meet certain minimum procedural safeguards). Indeed, the Supreme Court in *Davis* observed that "abuses" can occur in an investigatory detention, mentioning specifically an "improper line-up." *Davis v. Mississippi, supra,* 394 *U.S.* at 727, 89 *S.Ct.* at 1398, 22 *L.Ed.*2d at 681. As a result, in order to guarantee that the detention and accompanying intrusion is not improper or abusive, it must be accomplished in a fashion designed to produce the least amount of harassment of, interference with, or prejudice to the suspect. *See, e.g., N.C.Gen.Stat.* § 15A–279 (1978); ALI, Model Code of Pre-Arraignment Procedure §§ 160.2, 170.7 (1975); Proposed *F.R.Crim.P.* 41.1(i) (1971). Further, in most cases, the suspect must be given sufficient notice of the pro-

posed detention.[8]  *See, e.g., N.C.Gen.Stat.* § 15A–274. The suspect should also be given the opportunity to arrange a convenient time for the detention, *In re Fingerprinting of M.B., supra; see, e.g., N.C.Gen.Stat.* §§ 15A–275; ALI, Model Code of Pre-Arraignment § 170.4; Proposed *F.R.Crim.P.* 41.1(e), and the opportunity to have counsel present during the detention. *See, e.g., N.C.Gen.Stat.* § 15A–279(d); *Idaho Code* § 19–625(2)(H) (1979). In addition, unusual or untoward consequences to the suspect resulting from the detention should be avoided or minimized.[9]

We think that these procedural safeguards protect citizens' constitutional rights. We are also satisfied that the evidential standard that we · adopt, *ante* at 561–62, allows police to investigate serious offenses without unduly interfering with the liberty or privacy of a person who has not been charged with any crime. In our view, these procedural requirements, in conjunction with the evidential standard, represent a proper balancing of the public interest in effective law enforcement

---

[8]We acknowledge that certain exigent circumstances will demand prompt police action. For example, police investigators may be required to act swiftly if they reasonably believe that a suspect will radically alter his appearance or flee. In such cases, effective law enforcement will be thwarted by requiring judicial authorization for a detention order, granting the suspect the opportunity to contest a motion for a judicially authorized order and providing notice to the suspect and an opportunity to arrange a convenient time for the detention. Therefore, in such circumstances, prior judicial authorization need not be an absolute requirement. We caution, however, that upon any subsequent motion by the suspect to suppress the results of such a detention, the State bears the heavy burden of proving that the exigent circumstances duly justified dispensing with the required procedures and that the detention satisfied the federal and State constitutional guarantees against unreasonable searches and seizures. *See, e.g., United States v. Place,* —— U.S. ——, 103 *S.Ct.* 2637, 77 *L.Ed.*2d 110 (1983).

[9]For example, all investigative results could, if appropriate, be destroyed on request of the suspect if, within a reasonable amount of time, there remains no probable cause to link him to the offense being investigated. *See, e.g., N.C.Gen.Stats.* § 15A–280; ALI, Model Code of Pre-Arraignment Procedure § 170.8(4); Proposed *F.R.Crim.P.* 41.1(j).

and the liberty and privacy interests of the individual under the federal and State constitutions.

## IV

■ Applying these judicially formulated guidelines to this case, we believe that the circumstances surrounding defendant's detention and lineup clearly and adequately satisfied his constitutional right to be free from unreasonable searches and seizures. Defendant was linked to the commission of serious offenses for which he was ultimately convicted. According to the affidavit in support of the motion to compel the lineup, defendant was identified by an informant as the robber depicted in the composite sketch that was prepared by the police with the assistance of the victims of the crime. Also, one eyewitness of the crime had already made an equivocal identification of defendant's photograph. Based on this substantial information, the prosecutor moved for a detention order. Defendant, accompanied by counsel, was permitted to contest the motion. The trial judge found that Detective Booket's affidavit established an articulable, well-founded belief that defendant was involved in the commission of the particular offenses. Thus, upon notice to the defendant and with provisions for him to be heard, the detention order was authorized by a neutral and detached judge.

Further, in this case, the degree of intrusion into the individual's interests was certainly reasonable when measured against the degree of proof presented and the government interest involved. The detention was brief. It was conducted upon ample notice and at a convenient time. Defendant was not required to perform any creative act or give evidence not otherwise readily visible. Significantly, no interrogation occurred. Unquestionably, defendant's lineup detention, safeguarded by adequate restrictions, was beyond legal reproach.

## V

The subject of investigative detention is one that merits comprehensive consideration. This subject matter, like tele-

phonically authorized searches, which we recently considered, *see State v. Valencia, supra,* is more appropriately treated through the exercise of the Court's rule-making power or by legislative action. The subject of investigative detentions has received considerable attention from commentators and in several other jurisdictions that have enacted thorough and detailed schemes regulating pre-charge and pre-arrest investigative detentions.[10] The myriad of factors that can affect the constitutionality of an investigative detention, including the evidential standards that may justify a detention, the degrees and types of intrusions, and the procedures that must accompany a detention, persuade us to refer this matter to a rule-making committee for careful study. The public interest in effective law enforcement and in the containment of criminal activity argues in favor of such investigative detentions provided that safeguards are fashioned to protect basic constitutional rights. We therefore direct the Criminal Practice Committee of the Supreme Court to consider the subject of investigative detentions. The practices of other jurisdictions and literature on the topic provide a starting point for the consideration and formulation of appropriate rules and guidelines governing such detentions.

---

[10]For legislative treatment, see, for example, *Ariz.Rev.Stat.* § 13–3905 (1978); *Idaho Code* § 19–625 (1979); *N.C.Gen.Stat.* § 15A–271 *et seq.* (1978 & Supp.1982); *Del.Code Ann.* tit. 11, § 1901 *et seq.* (1979). *S.*2997, proposing 18 *U.S.C.* § 3507, was introduced in the Senate in 1969, *see* 115 *Cong.Rec.* 28896, but remains unadopted as does Proposed Rule 41.1 of the Federal Rules of Criminal Procedure, *see* 52 *F.R.D.* 409, 462–67 (1971). See also American Law Institute, Model Code For Pre-Arraignment Procedures, Art. 170 (1975). Numerous commentators have made observations on the topic. See, for example, Note, "Temporary Detention For Lineup Identification With Less Than Probable Cause Permissible Under The Fourth Amendment," 18 *Wayne L.Rev.* 827 (1972); Comment, "Detention for Taking Physical Evidence Without Probable Cause," 14 *Ariz.L.Rev.* 132 (1972); Note, "Detention To Obtain Physical Evidence Without Probable Cause: Proposed Rule 41.1 Of The Federal Rules Of Criminal Procedure," 72 *Colum.L.Rev.* 712 (1972); Comment, "Nontestimonial Identification Orders Without Probable Cause," 12 *Wake Forest L.Rev.* 387 (1976); Steele, "A Proposal To Legitimate Arrest For Investigation," 27 *Sw.L.J.* 415 (1973).

## VI

In conclusion, we hold that there is jurisdictional authority that empowers the Superior Court to issue process to compel a suspect to submit to an investigative detention. This power derives from the court's constitutional power to protect citizens from unreasonable searches and seizures. Orders authorizing an investigative detention may be issued upon less than probable cause according to the evidential standards that we have imposed. Further, the types of nontestimonial identification procedures conducted pursuant to such detentions will be limited and must conform to the procedures that we have specified. These standards and procedures are designed to meet the requirements of the Fourth Amendment and the comparable State constitutional provision by minimizing the intrusions upon individual privacy and liberty interests occasioned by such investigative detentions.

Although the complexity of the subject matter prompts us to direct the Criminal Practice Committee of the Supreme Court to study the issue of investigative detentions and recommend rules to be implemented in this jurisdiction, the standards and procedures utilized in the instant case fully comported with the federal and New Jersey constitutions and conformed to the guidelines prescribed herein. Accordingly the judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For reversal—None.*