**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0789-17T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

AMIR H. JEFFERSON,

    Defendant-Appellant.

_____

Submitted March 20, 2019 - Decided May 22, 2019

Before Judges Fuentes and Accurso.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 14-04-0413.

Joseph E. Krakora, Public Defender, attorney for appellant (Kevin G. Byrnes, Designated Counsel, on the brief).

Andrew C. Carey, Middlesex County Prosecutor, attorney for respondent (David Michael Liston, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following the denial of his motion to suppress evidence seized in a warrantless search, defendant Amir H. Jefferson pleaded guilty to second-degree possession of a controlled dangerous substance with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(2), and third-degree promoting prostitution, N.J.S.A. 2C:34-1(b)(2). After the judge denied his motion to withdraw his plea, defendant was sentenced on the drug conviction in accordance with a negotiated agreement to a term of ten years in State prison, with five years of parole ineligibility, and to a concurrent five-year term on his conviction for promoting prostitution. Defendant appeals from the denial of his motions to suppress and withdraw his guilty plea as well as from his sentence. Finding no basis to disturb the trial court's factual findings or legal conclusions on any of these issues, we affirm.

The only witness to appear at the suppression hearing was the arresting officer. He testified he had been temporarily assigned to the detective bureau to aid in locating a missing person, a young woman addicted to heroin who had reported to her mother that her pimp had assaulted her. Detectives suspected the pimp was supplying the woman with heroin. Police met her in room 526 at a hotel in Edison in the middle of the day. After sweeping the hotel corridor, including a vending area, two officers entered the young woman's room, while

the arresting officer remained in the hallway waiting for the suspect pimp. Other officers were similarly stationed on other floors of the hotel.

Although the witness testified that other officers had a fuller description of the suspect, the only description provided the witness was that the suspect was "a larger black male." About forty-five minutes after the officer took his position on the fifth floor, defendant, a black man, about 6'2" or 6'3" and weighing over three hundred pounds, got off the elevator and started down the hallway toward room 526. According to the officer, as defendant passed, he glanced at the large police radio the officer was holding, looked at his own cell phone and turned and walked in the opposite direction. As he did so, the officer noticed defendant move his left hand over his jacket pocket as if to conceal something.

Defendant entered the vending area, about five feet away from where the officer was standing. After hearing "some rustling and . . . two soft thuds," the officer pulled his service weapon and ordered defendant out into the hallway. Defendant emerged holding a couple of dollar bills in his hand. The officer radioed he had a possible suspect, ordered defendant to his knees and was in the process of handcuffing him when two officers emerged from room 526 to assist. The woman then stepped into the hallway saying, "That's him," and defendant

3

was arrested. Asked how much time elapsed between ordering defendant out of the vending area and his arrest, the officer said it was "[a] minute, tops."

Asked why he pulled his gun before ordering defendant into the hallway, the officer testified he did it for his safety, explaining the police had information defendant was involved in narcotics, and "with drugs there are guns." Although no drugs or weapons were found on defendant in a search incident to his arrest, police discovered drugs in the vending area. The witness testified that when he entered the vending area after defendant's arrest, he smelled raw marijuana, which was not present when he did his protective sweep. Borrowing a chair from one of the guest rooms, the officer found five baggies of marijuana, 197 wax folds of heroin and 31.5 grams of cocaine in the drop ceiling.

After hearing that testimony and the arguments of counsel, the trial court judge denied defendant's motion to suppress the drugs as fruit of the poisonous tree. The judge rejected defendant's argument that he was arrested without probable cause when the officer ordered him to his knees at gunpoint and handcuffed him. The judge found the officer did not immediately accost defendant as he got out of the elevator but "allowed him some movement." Observing those movements, defendant walking toward room 526, abruptly switching direction after noticing the officer holding a police radio, and then

4

rustling around in the vending area, gave the officer reasonable articulable suspicion to effect an investigative detention. The judge found that there might have been other innocent explanations for defendant's conduct did not take away from the officer's reasonable suspicion. The judge found the officer credible and his testimony unrebutted. The judge rejected defendant's argument that the officer drawing his weapon and handcuffing him turned the detention into an effective arrest. The judge found the detention was brief, and that the officer acted out of consideration for his safety.

Three-and-a-half years after the decision on the suppression motion and a week before a second scheduled trial date, defendant entered his guilty plea. During the period between denial of the suppression motion and the plea, defendant switched counsel several times and pursued unsuccessful motions made at different times to dismiss the human trafficking count and sever the drug counts of the indictment from those relating to human trafficking and promoting prostitution. Although expressing dissatisfaction during the plea colloquy with the court's unwillingness to "develop the record on the conflict of interest issues that haven't been ruled on" and his counsel's unwillingness to obtain the victim's phone records, defendant told the court he was satisfied with

his attorney's advice, that no one had forced or pressured him to plead guilty and that he was doing so because he was guilty.

At his sentencing four months later, however, defendant moved with new counsel to withdraw his plea and assert a claim of ineffective assistance of plea counsel. He also filed two pro se motions to reconsider the denial of his suppression motion and his motion to dismiss the indictment. Defendant claimed he did not possess the drugs found in the vending area ceiling and that he had no knowledge the victim was meeting with men for sex. He also claimed the only reason he pleaded guilty was because plea counsel made "a hidden promise with . . . the Prosecutor's Office" that the case "would be over, closed, there'd be no parole" after the five-year parole ineligibility term.

The State opposed the motions, asserting defendant had no colorable claim of innocence as the State had defendant's records of the victim's appointments and text messages between the two indicating defendant was distributing drugs to her after she engaged in sexual acts with others for money. The prosecutor asserted the texts showed the victim was "begging [defendant] for [drugs] because she has an addiction" and he was giving her drugs on a daily basis in order to keep control over her. The prosecutor also recounted the long delays in prosecuting the case occasioned by defendant switching lawyers five times, and

6

noted the State had twice prepared for trial. The prosecutor asserted those long delays would prejudice the State were it to have to try the four-year-old-case, notwithstanding the victim's continued willingness to testify.

Reviewing all four Slater[1] factors, the judge found defendant lacked any colorable claim of innocence, defendant's reasons for wishing to withdraw his plea were not borne out in the record, the existence of a plea bargain favored the State and withdrawal of the plea would cause the State unfair prejudice due to the long delay in prosecuting the case as defendant cycled through several lawyers. Recalling the extended colloquy in which he engaged defendant before accepting his plea, the judge further pronounced himself satisfied that defendant had entered into it willingly with full knowledge of the consequences. The judge denied defendant's pro se motions for reconsideration as without basis and determined his ineffective assistance claim was not ripe for review, see State v. Preciose, 129 N.J. 451, 459-61 (1992).

The State asked the court to sentence defendant in accordance with the plea agreement. The victim spoke at sentencing. She claimed defendant made

---

[1] State v. Slater, 198 N.J. 145 (2009). The four Slater factors are: "(1) whether the defendant has asserted a colorable claim of innocence; (2) the nature and strength of defendant's reasons for withdrawal; (3) the existence of a plea bargain; and (4) whether withdrawal would result in unfair prejudice to the State or unfair advantage to the accused." Id. at 157-58.

A-0789-17T2

her "perform unspeakable sexual acts with him and with the clients that he made appointments with for [her.]" She claimed defendant kept her prisoner for nine months, moving between states along the eastern seaboard every few days. She ate only when he fed her, which he did not do sometimes for days at a time to keep her at a weight he thought ideal, and became violent when she resisted him. In addition to the mental anguish he caused her to endure, she also revealed she contracted HIV during her months with defendant.

The judge found aggravating factors two, the gravity and seriousness of the harm inflicted on the victim; three, the risk defendant would commit another offense; six, the extent of defendant's prior criminal record and the seriousness of the offenses of which he was convicted; and nine, the need to deter, N.J.S.A. 2C:44-1(a)(2), (3), (6) and (9), and no mitigating factors. Noting the extent of defendant's prior record, and having earlier noted he would have faced a mandatory extended term if convicted at trial of the drug offense to which he pleaded guilty, the judge sentenced defendant in accordance with his plea agreement to an aggregate ten-year term, with five years of parole ineligibility.

Defendant raises the following issues for our consideration:

POINT I

THE DEFENDANT'S RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES AS

8

GUARANTEED BY THE FOURTH AMENDMENT TO THE <u>UNITED STATES CONSTITUTION</u> AND ART. I, PAR. 7 OF THE <u>NEW JERSEY CONSTITUTION</u> WAS VIOLATED.

    A. The Defendant Was Arrested without Probable Cause.

    B. The State Failed to Prove that the Police Had Reasonable Suspicion to Detain the Defendant.

    C. The Warrantless Seizure, Ignoring the Law of Detention Warrants, Was Unreasonable.

    D. Even if the Police Had a Detention Warrant, the Manner in which this Detention Occurred — Pointing a Gun at an Unarmed Black Man — Was Unreasonable.

<u>POINT II</u>

THE DEFENDANT'S MOTION TO VACATE THE PLEA AGREEMENT SHOULD BE GRANTED.

    A. The Plea Agreement Should Be Set Aside in the Interests of Justice.

    B. The Plea Agreement Should Be Set Aside Because It Was the Result of Ineffective Assistance of Counsel.

<u>POINT III</u>

THE SENTENCE IS EXCESSIVE: THE TRIAL COURT IMPROPERLY BALANCED THE AGGRAVATING AND MITIGATING FACTORS.

9

We find none of these arguments availing and confine our comments to the first point. Defendant's arguments regarding his motion to withdraw his plea and that the sentence imposed in accordance with the plea agreement is excessive lack sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(2).

Turning to defendant's first point, our standard of review on a motion to suppress is well established. State v. Gamble, 218 N.J. 412, 424-25 (2014). We defer to the trial court's factual findings on the motion, unless they were "clearly mistaken" or "so wide of the mark" that the interests of justice require appellate intervention. State v. Elders, 192 N.J. 224, 245 (2007) (quotations omitted). Our review of the trial court's determinations of reasonable suspicion and probable cause, however, is de novo, Ornelas v. United States, 517 U.S. 690, 699 (1996), without deference to the trial court's interpretation of the law, State v. Hubbard, 222 N.J. 249, 263 (2015).

Applying that standard here, we find no fault in the trial judge's factual findings or his application of the law to those facts. We have no doubt defendant was seized within the meaning of the Fourth Amendment the moment the officer drew his weapon and ordered defendant out of the vending area. See Kaupp v. Texas, 538 U.S. 626, 629-30 (2003); United States v. Mendenhall, 446 U.S. 544, 554 (1980); State v. Crawley, 187 N.J. 440, 450 (2006). We are likewise

satisfied the officer had a reasonable suspicion, grounded in specific and articulable facts and his rational inferences, that defendant may have been the suspect police were waiting for, that criminal activity was afoot, and that defendant was armed and dangerous. See Terry v. Ohio, 392 U.S. 1, 9, 30 (1968).

Defendant's argument that he was seized merely because he was a large black man ignores the officer's credible testimony that defendant started down the corridor to the room where the victim had arranged to meet him, abruptly switched directions after looking at the officer's police radio, moved his hand up as if to cover a jacket pocket as he passed and then stepped out of the officer's sight into a closed area from which the officer heard rustling noises. See State v. Privott, 203 N.J. 16, 30 (2010). Those facts distinguish this case from State v. Shaw, 213 N.J. 398, 411, 422 (2012), in which the Supreme Court affirmed our finding of an impermissible investigatory detention where "[t]he only descriptive feature Shaw shared with the fugitive sought . . . was that he was a black man," doing nothing to have aroused any suspicion he was engaged in criminal activity.

We also agree with the motion judge that the officer drawing his service weapon and, under these circumstances, handcuffing defendant, did not convert

defendant's detention into a de facto arrest. See State v. Padilla, 321 N.J. Super. 96, 107-08 (App. Div. 1999), aff'd, 163 N.J. 3 (2000). Timing is important, and the briefness of this detention, lasting at most a minute, and our inability to conclude the officer used unreasonable force in executing it, convince us defendant was not subject to a de facto arrest. See State v. Dickey, 152 N.J. 468, 479 (1998).

Finally, we reject defendant's argument that even if the police had "reasonable suspicion, the search and seizure was nevertheless illegal because the police had ample time and opportunity to secure a detention warrant pursuant to State v. Hall, 93 N.J. 552 (1983), but failed to do so." Woodbridge Police were investigating defendant based on reports from the victim and her mother that defendant was promoting prostitution and distributing narcotics. But the investigative detention defendant complains of in this case arose out of defendant's suspicious behavior when he encountered the officer in the hotel where the victim was staying. "An officer does not need a warrant to make such a stop if it is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Rodriguez, 172 N.J. 117, 126-27 (2002) (quoting

<u>Terry</u>, 392 U.S. at 21).   Because we are satisfied defendant's investigative detention complied with <u>Terry</u>, no warrant was required.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION